Filed 3/29/24  P. v. Clarke CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>KEVIN EDWARD CLARKE,<br><br>      Defendant and Appellant. | A166554<br><br>(San Mateo County<br>Super. Ct. No. SC055709B) |

In 2005, a jury convicted Kevin Edward Clarke of multiple offenses including first-degree murder with special circumstances.  Clarke was sentenced to life in prison without the possibility of parole, plus 14 years.  In 2007, a different panel of this court affirmed the judgment.  (*People v. Clarke* (Mar. 22, 2007, A112245) [nonpub. opn.] (*Clarke I*).)

This appeal is from a November 2022 order denying Clarke's petition for resentencing.  (Pen. Code, § 1172.6.)[1]  The trial court issued an order to show cause and conducted an evidentiary hearing before denying Clarke's

---

[1] Statutory references are to the Penal Code.  Clarke filed his resentencing petition under former section 1170.95, which was subsequently amended, effective June 30, 2022, and renumbered as section 1172.6 without any substantive change.  (*People v. Vargas* (2022) 84 Cal.App.5th 943, 947, fn. 2; see Stats. 2022, ch. 58, § 10.)

petition.  On appeal, Clarke challenges the sufficiency of the evidence to support the court's findings.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

## I.  The Murder of Kenneth Hamel

In April 2003, Kenneth Hamel was shot and killed in his apartment. At Clarke's 2005 trial, the jury heard evidence about Hamel's murder and testimony from multiple witnesses regarding Clarke's role in that crime.[2]

### *The Shooting Incident and Murder Scene*

On April 10, 2003, at around 6:00 or 7:00 p.m., Hamel's 12-year-old neighbor, A.G., saw two men in "ski mask[s]" enter the open door of Hamel's apartment.  The men stayed inside the apartment for 8 to 10 minutes before running out.  A.G. then heard a woman scream.  At approximately the same time, Katie W. (Katie), Hamel's lateral neighbor, was sitting on her couch inside her apartment when she noticed she had been shot in the stomach. She ran from her apartment, seeking help from her building manager Frank J. (Frank).

Meanwhile, Frank heard "two explosions," came out of his apartment, and saw two men running or walking fast towards him.  One was hooded and wearing a ski mask or scarf and the other was "bare headed."  Within

---

[2]  In his appellate brief, Clarke adopts the factual summary set forth in *Clarke I*, contending erroneously that we may rely on that summary to conduct our review.  Section 1172.6, subd. (d)(3) only allows the reviewing court to "consider the *procedural history* of the case recited in any prior appellate opinion."  (Italics added.)  By specifying " ' "the procedural history," ' " "the Legislature intended to prohibit consideration of 'the factual summar[y]' in a prior appellate opinion."  (*People v. Bratton* (2023) 95 Cal.App.5th 1100, 1113, italics omitted.)  Here, the court below based its findings on trial transcripts and other evidence presented at the resentencing hearing.  We base our review on the same evidence that was before the trial court.

2

seconds, Frank heard Katie scream that she had been shot, diverted his attention to her, and called emergency services. Frank later identified Clarke as the unmasked man.

When police Sergeant Kevin Fung arrived at the scene, he went first to Katie's apartment and saw a bullet-like hole in the wall. In Hamel's apartment, Fung smelled marijuana, and found two piles of what looked like cocaine base, a scale, and some marijuana in plain view. Hamel was on the couch with blood coming out of his mouth and an apparent gunshot wound to his abdomen. He was declared dead at the scene. Evidence collected from Hamel's apartment included an unfired bullet, stashes of cash in several parts of the house, money in the victim's pocket, bags of marijuana and cocaine, and a nine-millimeter semiautomatic handgun recovered from behind the couch.

An autopsy established that Hamel died from multiple "gunshot wounds." As to a gunshot wound to his neck, the evidence showed that the gun was pressed against Hamel's skin when his assailant pulled the trigger. Hamel did not show signs of "[d]efensive injuries."

*Erika G.*

Erika G. (Erika) testified that, in April 2003, she and her boyfriend, William M. (William), were friends with Clarke and his ex-girlfriend, Amanda M. (Amanda). On the evening of April 10, the day of Hamel's murder, Erika, William, and Amanda were outside the house Erika shared with William when Clarke and his associate, Brian Parker, arrived by car. Clarke ran into the house carrying in his hand a black gun with a brown handle (not a revolver), and Parker followed. Erika and Amanda also went inside because Erika was worried for her children, who were in the house.

3

Erika testified that she was in a bedroom with Amanda when she heard Clarke in the bathroom making a clicking sound. Then Clarke came into the bedroom, still holding the gun. He was "very upset," and explained that he and Parker "went to rob" someone but "everything went bad," the victim had a gun, and "they had to . . . kill somebody." Clarke said that Parker "had to shoot" the victim "a couple of times," the victim did not "die after the first time," and Parker "had to shoot him some more." Clarke told Erika that he and Parker "only got $27 and some change" in the robbery, but they initially expected to obtain $90,000. He took the money from his pocket and put it on the bed. Clarke also said that he tried to shoot someone else in the apartment but "his gun jammed," and he was still trying to unjam it when he was in the bathroom. When Clarke left the bedroom, he took the gun with him in a shoebox and put it in the trunk of his car.

Back outside, Erika overheard Parker tell William that he and Clarke had committed a robbery, and Parker shot and killed the victim, who had a gun. Erika testified that Clarke and Parker separately recounted "that the two of them went to do this robbery," neither stated they acted alone, and she agreed when the prosecutor described this as a joint operation. Eventually, Clarke and Parker left the house, but Clarke returned later that night and slept in his car.

Subsequently, Erika became concerned about a fresh hole in her backyard and contacted the police because she had heard people in her yard and suspected a gun was buried there. The police excavated the hole and found a .357-caliber Colt King Cobra revolver. The gun was analyzed by a firearms expert who determined that it was the murder weapon.

At trial, Erika acknowledged that she had taken cocaine on the day of Hamel's murder, but she felt "pretty sober" when Clarke and Parker came to

4

her house. Erika also testified that Clarke "was very heavy into heroin" at the time, he "was always" under the influence of drugs, and he said he had been drinking. Nevertheless, Erika "understood what [Clarke] was saying."

### William M.

William testified that, a few days before April 10, 2003, Clarke and Parker approached him about their plan "to rob a drug dealer" in the South Bay. They told William they needed guns because the victim "might be armed," that they expected to get $60,000 "plus" in the "[l]ick," and that William should bring a shotgun. William agreed to participate. However, Clarke later told William that William would not take part in the scheme because Parker did not know William and did not "want [him] there."

The day before Hamel was killed, Clarke told William that he and Parker were "going to . . . East Palo Alto in connection with [the] robbery." The next day, they returned to William's house at around 7:00 or 8:00 p.m., and Clarke told William "they murked" a man—slang for murder. William had consumed a large amount of cocaine that day, but he clearly recalled the conversations he had with Clarke and Parker that night because he had never "dealt with anything like this before." Clarke "was upset, loud," and he appeared to be under the influence of heroin. Parker did not "appear to be agitated or upset in any way." Clarke had a nine-millimeter semiautomatic gun in his waistband, and Parker had a "chrome .357" magnum-caliber revolver.

William testified that Clarke and Parker recounted the following events to him: When they entered Hamel's apartment, Hamel reached for a firearm, and Parker wrestled him. Clarke went in the kitchen looking for things "[t]o steal" and was covering a second person in the kitchen when he heard gunshots. Clarke tried to shoot the man in the kitchen, but his gun

5

jammed. Clarke "went into the bedroom and continued to look for stuff when he . . . hear[d] more shots" and decided to leave. Clarke took $27 and "some change" from the apartment and expressed disgust they killed a man over that amount of money. Clarke put the .357-caliber revolver in a shoebox, then "took it outside, put it in his trunk."

William testified that on the night of the shooting, he and Parker had a private conversation about the revolver that Parker used to shoot Hamel, and the gun that Clarke used during the robbery. Parker did not trust Clarke with the weapons, given Clarke's "state of sobriety and emotional state." He asked William to hold the semiautomatic gun "temporarily" and to bury the revolver. William put the semiautomatic in his safe, and, after Clarke left the house, retrieved the shoebox from the trunk of Clarke's car, wiped down the revolver and buried it in the backyard. About an hour later, Parker returned to the house, retrieved the semiautomatic gun from the safe, and left.

William recalled that, about a week after the shooting, Clarke was at his house when the police arrived, took Clarke in for questioning, and spoke to William. William did not tell them what he knew because he feared Parker and possible repercussions for the murder weapon in his backyard. At that time, William did not know that the police had already recovered the revolver with Erika's permission.

On July 31, 2003, William told the police he had buried the murder weapon and explained what he knew about the crimes. William was later arrested for being an accessory after the fact to murder and pleaded no contest. He expected to be sentenced to probation in exchange for his agreement to testify fully and truthfully at Clarke's trial.

### Amanda M.

Amanda testified that when she was with Erika and William on April 10, 2003, she ingested "[a]bout two lines" of cocaine, which made her "very alert and oriented." When Clarke and Parker arrived, they went inside quickly, "straight to the back bedroom." She and Erika followed them into the bedroom, where Clarke said, "We killed somebody in East Palo Alto." Clarke did not discuss who did it or what was happening at the time, but said it was "[a] robbery gone bad." Clarke stated he obtained "[c]hange" in the robbery and placed coins on the bed, along with a "dark" semiautomatic gun. Amanda saw Clarke "try[] to unjam his gun," then left because she did not "want any part" in the incident.

In the weeks following the crimes, Clarke tried to explain how the victim was killed and said, "it was a robbery gone bad," but Amanda did not want to hear details and would cut him off. Clarke's drug use was one of the reasons Amanda broke up with him. Around early April 2003, Clarke used heroin daily by "[s]norting it" and became "really edgy," "impatient," "aggressive," was "always in a hurry," and "talked fast." Clarke behaved in that manner the night of the killing, Amanda testified.

### Clarke's Police Interviews

When the police first interviewed Clarke on April 16, 2003, he denied knowing Parker, said he was " 'piddling around' " American Canyon on the day of Hamel's murder, and claimed that Erika and William could "vouch for him."

A later interview conducted on June 30, was played for the jury and admitted into evidence. During that interview, Clarke initially claimed that Parker had committed a murder-for-hire. Later, he told a story about "a

robbery [gone] bad" that Parker allegedly planned with an individual named James M. (James).

Clarke told police that he found out about the robbery plan the day before the crimes, when Parker told him, "I got a lick in [East Palo Alto]. Come on, out with me." Parker did not give details other than they "were gonna hit" a "dude [who] thinks he's John Gotti" and take "[d]rugs and money." The next morning, Clarke drove Parker to Palo Alto in Parker's car so Parker could collect money from certain individuals. Clarke referred to this as going "on a paper route." Their second to last stop was James's apartment, where they obtained a revolver and a nine-millimeter gun. When Clarke asked Parker why they needed the guns, Parker said, "[J]ust take it," and Clarke said, "[A]ll right."

Clarke told police that when they arrived at Hamel's apartment, Parker put a mask on and took out the revolver, as Clarke knocked on the door. Clarke watched Parker "take care of" Hamel, who also had a gun. They wrestled, and Parker fired his weapon. A second person in the apartment "ran into the kitchen." Clarke pulled out the nine-millimeter gun and racked it, causing a bullet to fall out. Clarke denied pointing the gun at the second individual or firing it. After Parker fired a third shot, Clarke left the apartment. Parker was still shooting, but stopped before Clarke reached the front door. Clarke stated during the interview, "I'm done. Murder-robbery. . I blew it."

### Clarke's Trial Testimony

Clarke testified that he was on parole for a felony conviction when he met Parker at a "halfway house," where they were roommates. Clarke knew Parker had been incarcerated for "murder" or "manslaughter."

8

Clarke told the jury that on the evening before the crimes, Parker explained "that he needed to get to Palo Alto [the next day] to pick up money that was owed to him from various individuals." On the morning of the crimes, Clarke believed he "was just a driver" and was not "into the physical aspect of getting [Parker's] money." However, Clarke agreed with the prosecutor that it helps to have two people collect money "because it overcomes resistance just being there" and "carrying a firearm . . . makes it even easier to collect." The last stop on their "paper route" was James's house, where James gave Clarke a nine-millimeter gun and said it was "ready." Clarke claimed he had never fired a gun and assumed that all he had to do was pull the trigger. He later testified that the gun was not for specific use in Hamel's apartment, because he "wasn't going to shoot anybody." He accepted the gun because he was scared to find himself in a "sticky situation" involving guns. Clarke knew that because he was a felon, he was not supposed to possess a firearm. He explained he "took the weapon because [he] was pressured into taking [it]," and because he was so high at the time.

Clarke testified that when they reached Hamel's apartment, Parker entered first as he put on a mask. At that point, Clarke realized he "was in some type of problem." Clarke did not have a mask and did not know what was going to happen. He had not been told anything about the apartment containing money or drugs or that the victim was a drug dealer. Once inside, Parker said nothing and started firing a "very large revolver."

Clarke initially testified that Parker fired the first shot "[i]mmediately" upon entering the apartment, while "[a] foot" away from Hamel. Later, he claimed not to know who fired the first shot; he heard it but did not see it. He was "shocked" and "ducked" "in a crouching position." Four more shots

9

"[i]mmediately" ensued.  Clarke pulled out the nine-millimeter gun and "noticed that there was a cartridge stuck in it."  Clarke "rigged" the gun and the cartridge "popped out."  He pulled the gun out for protection because people were shooting but he "was dazed in terms of why [he] needed a firearm."

Clarke did not turn around and run away when the shooting started; he instead moved to a counter in the kitchen where he saw another man "crouched" behind the refrigerator.  Clarke was near the place where police later found the unfired bullet when he pulled out his weapon.  While crouched down, Clarke racked the gun after discovering it was "stove piped," meaning not functional.  Clarke "continued to play with it" because he was "scared" and "protecting [him]self."  Clarke denied that his job was to cover the second man in the kitchen and said he was not worried about that man.  The man screamed, " 'don't shoot me,' " but Clarke denied trying to shoot him, testifying that the counter would have blocked his shot.  Meanwhile, he could hear shots firing, and when he realized what was going on, he "headed to the door."

Clarke acknowledged that when he and Parker went to Erika's and William's house after the shooting, he brought the revolver in the house.  He left the nine-millimeter gun in the backseat of the car and did not know what happened to it afterwards.  He put the revolver in the trunk of his car because there were children in the house.  Clarke denied telling Erika and William "this was a robbery gone bad," but acknowledged telling Amanda "it possibly was a robbery."  He told the police it was a robbery gone bad because he "told them what they wanted to hear."  He denied taking anything from Hamel's apartment and testified that the $27.50 he showed to Erika was money he had "from change."  He said Erika and Amanda were mistaken that

10

the money was taken from Hamel's house, and the women and William were mistaken "[a]bout that robbery aspect."

Clarke testified that prior to his arrest for Hamel's murder, he used heroin daily, and during his police interview, he was "coming down off of heroin." On the day of the crimes, he "sniff[ed]" heroin "[m]aybe every two hours," and drank alcohol in the afternoon. He had to use heroin every day or he would "get very sick," and he acknowledged that a heroin addict "need[s] to take [heroin] not to get high but just to stay ripe," but stated he "wasn't at that level yet." Clarke used "cocaine once a day" and heroin "two or three times a day," sometimes mixing both. He agreed that after using heroin, cocaine "kind of picks you up, makes you kind of edgy." This was Clarke's drug habit when he went with Parker to collect the money on April 10, 2003.

## II.  Procedural History

Pursuant to an amended information filed against Clarke and Parker in October 2005, Clarke was charged with Hamel's murder, with special circumstance allegations that he committed murder during commission or attempted commission of a burglary and robbery, and with the additional allegation that he personally used a firearm (§§ 187, subd. (a), 190.2, subd. (a)(17), 12022.53, subd. (b)). Clarke was also charged with robbery (§ 212.5, subd. (a)), burglary (§ 460, subd. (a)), and other crimes, as well as multiple enhancements.

Clarke and Parker were tried separately. "On October 3, 2005, the jury found [Clarke] guilty of murder with the special circumstances of committing murder while engaged in the commission or attempted commission of robbery and burglary. The jury also found [Clarke] guilty of attempted robbery (a lesser included offense), burglary, shooting a firearm at an inhabited

11

dwelling, assault with a firearm, and firearm possession by a felon.  The jury found true that [Clarke] was armed in connection with all offenses (except the firearm possession offense, an element of which is being armed), and that he had previously been convicted of a serious felony and had served a prior prison term." (*Clarke I, supra,* at pp. *7–*8.)  Clarke was sentenced to life in prison without the possibility of parole plus 14 years, and his conviction was affirmed on appeal.  (*Clarke I, supra,* at pp. *8, *14.)

On January 30, 2019, Clarke filed a petition for resentencing under former section 1170.95, which was added to the Penal Code pursuant to the enactment of Senate Bill 1437.  (*People v. Strong* (2022) 13 Cal.5th 698, 708 & fn. 2.)  The purpose of Senate Bill 1437 was " 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959.)  To that end, the Legislature amended provisions of the Penal Code pertaining to the felony murder rule (§ 189) and the natural and probable consequences doctrine (§ 188) and created a procedure for defendants "convicted under the former law to seek retroactive relief under the law as amended" by filing a petition for resentencing under section 1170.95, later renumbered as section 1172.6.  (*Strong*, at p. 708.)  To obtain relief, a petitioner previously convicted of murder must show, among other things, that he or she "could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a).)

The same judge who presided over Clarke's jury trial heard his resentencing petition.  The court found that Clarke stated a prima facie case for relief and issued an order to show cause.  An evidentiary hearing was held

12

on July 18, 2022.  Pursuant to the parties' stipulation, evidence considered by the trial court included a declaration by Dr. Gantt Galloway, Clarke's retained "expert in the field of pharmacology, specifically in the area of the effects of drugs, including alcohol and heroin, on the body and mind."

On November 2, 2022, the trial court denied Clarke's petition.  Framing the issues, the court observed that Clarke is "someone who should be considered for resentencing . . . as he was convicted of felony murder and clearly was not the actual killer."  For Clarke to be guilty of murder under a still-valid theory, the evidence would have to show that either he was a direct aider and abettor of murder, or he was both a major participant in the underlying felony and acted with reckless indifference to human life.  (§ 189, subd. (e)(3) (section 189(e)(3)).)  The court found that the prosecution failed to prove beyond a reasonable doubt that Clarke was a direct aider and abettor of murder but concluded that Clarke was a major participant in the robbery and burglary and acted with reckless indifference to human life.  Concluding that under the current state of the law, Clarke remains guilty of murder beyond a reasonable doubt, the court denied his resentencing petition.

## DISCUSSION

Clarke challenges the sufficiency of the evidence to support the trial court's conclusion that he is guilty of murder under current law.  Clarke's arguments raise two distinct issues, which we address separately:  first, whether the court's findings are generally supported by the evidence; and second, whether the court properly considered the evidence that Clarke was under the influence of drugs and alcohol when Hamel was murdered.

We review the trial court's factual findings for substantial evidence, and its application of those facts to a statute de novo.  (*People v. Williams* (2020) 57 Cal.App.5th 652, 663.)  Substantial evidence review is deferential;

we ask whether " ' "*any* rational trier of fact" ' " could have made a challenged finding, while viewing the evidence in the light most favorable to the prosecution.  (*In re Moore* (2021) 68 Cal.App.5th 434, 451 (*Moore*).)  Nevertheless, sufficiency of the evidence is "ultimately a legal question," requiring us to examine the record independently to determine whether substantial evidence supports a challenged finding.  (*People v. Banks* (2015) 61 Cal.4th 788, 804 (*Banks*).)

## I.  Sufficiency of the Evidence

The trial court found that Clarke remains guilty of murder under section 189(e)(3), which requires the prosecution to prove, beyond a reasonable doubt, that Clarke was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."  Section 190.2, subdivision (d) (section 190.2(d)) is the felony-murder special circumstance that applies when a defendant is not the actual killer but "with reckless indifference to human life and as a major participant, aids, abets . . . or assists in the commission" of a qualifying felony.  In construing this statute, our Supreme Court has articulated standards for determining whether the requirements of major participation and reckless indifference have been satisfied.  (*Banks*, *supra*, 61 Cal.4th 788; *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).)

To be a major participant in the underlying crime, a person must have substantial personal involvement beyond that of an ordinary aider and abettor.  (*Banks*, *supra*, 61 Cal.4th at p. 802; *Clark*, *supra*, 63 Cal.4th at p. 611.)  *Banks* delineates five non-inclusive factors to consider when evaluating the totality of the circumstances to determine if a defendant was a major participant in a crime that resulted in a death.  We consider the defendant's (1) role in planning the criminal enterprise; (2) role in supplying

14

or using lethal weapons; (3) awareness of dangers posed by the crime; (4) presence at the scene and actions or inactions relating to the death; and (5) conduct after lethal force was used. (*Banks*, at p. 803.)

The trial court concluded that Clarke's "participation in criminal activities, known to carry a grave risk of death, was sufficiently significant to be considered major." Clarke does not challenge the major participant finding, instead focusing on the reckless indifference requirement.

Our Supreme Court has identified the following factors as potentially relevant when considering whether a defendant acted with reckless indifference to human life: whether the defendant knew a weapon would be used or himself used a weapon, and the number of weapons that were used; whether the defendant was physically present at the crime and had an opportunity to restrain the crime or aid the victim; the duration of the interaction between the victim and the perpetrators; whether factors bearing on the likelihood that a cohort would kill the victim were known to the defendant prior to or during the commission of the felony; whether the defendant attempted to minimize the risk of violence during commission of the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623; *In re Scoggins* (2020) 9 Cal.5th 667, 677.) The factors identified in *Banks* are also relevant, " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark*, at p. 615.)

The resentencing court made a number of factual findings in support of its conclusion that Clarke acted with reckless indifference to human life, all of which we conclude are adequately supported by the evidence. The court found that Clarke knew he and Parker were going into the apartment to rob a drug dealer, who would most likely be armed; Clarke knew Parker had

15

previously been convicted of (at least) manslaughter; Clarke armed himself and tried to recruit William to have more guns available; Clarke was physically present in the apartment looking for things to steal and pursuing a second victim when Parker shot Hamel; Clarke tried to use his gun but was unable to because it jammed; and Clarke did nothing to assist the victim. Based on these facts, the trial court properly concluded the evidence established Clarke acted with reckless disregard for human life.

Clarke disagrees with our conclusion, making two sets of arguments. First, he challenges three discrete findings the trial court made, contending that each one, considered separately, does not support a finding of reckless indifference. Specifically, Clarke argues that accepting a weapon from James "does not establish conscious creation of a grave risk that death would ensue"; that Clarke's knowledge of Parker's "previous manslaughter conviction, without more, is not conclusive"; and that the fact he tried to use a gun that jammed should not be given decisive weight. We agree with Clarke that these facts in isolation may not be dispositive, as the totality of the circumstances must be considered when evaluating whether a defendant acted with reckless indifference. (*Clark*, *supra*, 63 Cal.4th at p. 617; *Banks*, *supra*, 61 Cal.4th at p. 803.) Here, the trial court did not rely exclusively on any one of these factors, and Clarke does not dispute that each is supported by substantial evidence. Thus, this first set of arguments fails.

With his second set of arguments, Clarke does dispute the sufficiency of the evidence underlying other findings. Specifically, Clarke contends that his own trial testimony establishes that he did not know the victim would have access to a firearm. Clarke's reliance on this conflict in the evidence reflects his misunderstanding of substantial evidence review, which requires us to assess the record in the light most favorable to the finding of the trier of fact,

16

drawing all reasonable inferences in favor of the judgment. (*People v. Reyes* (2023) 14 Cal.5th 981, 988; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.) Here, Clarke admitted to the police that Parker told him they were going to "hit" a "dude [who] thinks he's John Gotti" and take "[d]rugs and money." And William testified that when Clarke and Parker approached him before the crime, they said they wanted to rob a drug dealer and needed guns because the man "might be armed." From this evidence, the trial court drew a reasonable inference that Clarke knew the victim most likely would be armed.

Clarke also challenges the finding that he did not attempt to aid Hamel, contending that he never had that opportunity. The record shows otherwise. Clarke's presence in the apartment throughout the commission of the robbery, which apparently involved a physical struggle, supports the finding that Clarke theoretically had an opportunity to assist the victim but instead chose to assist his cohort. Testimony from Clarke and other witnesses established that during the robbery, he dealt with the second person in the kitchen and looked for things to steal while Parker killed Hamel.

Finally, citing *People v. Saibu* (2022) 81 Cal.App.5th 709, Clarke disputes the trial court's finding that the prosecution proved beyond a reasonable doubt that he knew his activities carried an elevated risk to human life, beyond that inherent in any armed robbery. *Saibu* is factually and legally inapposite. In that case, the trial court found that the People failed to carry their burden of proving the defendant acted with reckless indifference, whereas here the trial court reached the opposite conclusion. (*Id.* at pp. 715, 731–732.) *Saibu* was an appeal by the People, not a sufficiency of the evidence challenge. (*Id.* at pp. 737–738, 741.) Moreover,

17

the facts of the present case are easily distinguishable from *Saibu*, where the defendant was outside a liquor store when his cohort killed the victim, and there was no evidence that the defendant tried to shoot anyone. (*Id.* at pp. 729–730.) Here, by contrast, Clarke and Parker went into the victim's apartment together, and Clarke attempted to shoot another occupant and complete the robbery while Parker shot Hamel multiple times. These facts, along with evidence that Clarke helped to plan the armed robbery and to cover up the murder, substantially support the finding that the People proved beyond a reasonable doubt that Clarke acted with reckless disregard for human life.

## II. Evidence of Clarke's Addiction and Intoxication

Clarke contends the order denying his petition must be reversed because the trial court did not properly consider evidence of his intoxication and drug use when evaluating whether he had a conscious awareness of the risk associated with this robbery. This argument fails for multiple reasons.

First, the record shows that the trial court expressly did consider Clarke's intoxication evidence. It found that despite evidence of his heroin habit and alcohol consumption, Clarke appeared to be a functioning addict. The court based this conclusion on evidence showing that despite his addiction, Clarke "was very clear" about the goal of robbing a drug dealer, that he armed himself and attempted to recruit someone else with a gun, and that he tried to dispose of the gun after the murder.

Furthermore, Clarke misconstrues the significance of his expert evidence, which was admitted at the hearing pursuant to the parties' stipulation. Dr. Galloway did not offer the opinion that Clarke's subjective judgment was *actually* impaired when he participated in the crimes. Galloway's declaration addressed the psychological effects that heroin *can*

18

have on a person.  Galloway also offered the opinion that Clarke was under the influence of heroin and alcohol at the time of the shooting, which he based on his assessment of excerpts from the trial evidence provided to him by the defense.

Galloway's opinions were not binding on the trial court, in any event. The trial court acted as an independent fact finder in assessing the evidence presented at the hearing.  (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984.) "The fact finder determines the facts, not the experts."  (*In re Scott* (2003) 29 Cal.4th 783, 823, italics omitted.)  "Although experts may testify about their opinions, the fact finder decides what weight to give those opinions."  (*Ibid*.) Here, the record shows that after considering Galloway's opinions, the trial court remained persuaded that Clarke was subjectively aware of and willingly involved in the commission of dangerous felonies creating a grave risk that a death would occur.  In light of the evidence that Clarke had known a day or more before he committed the crime that the plan was to use firearms in robbing a drug dealer who "thinks he's John Gotti," we find no fault with the trial court's assessment.

Finally, Clarke draws an analogy between evidence of drug and alcohol use and cases establishing that youth is a relevant factor in determining whether a defendant acted with reckless disregard to human life.  (See *Moore*, *supra*, 68 Cal.App.5th at p. 454; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1090–1091.)  Clarke cites *People v. Avila* (2020) 57 Cal.App.5th 1134, which involved an unconstitutional sentence under the Three Strikes Law. (*Id*. at pp. 1140–1141.)  The *Avila* defendant was under 21 when he committed his strike priors, his current offenses were for nonviolent, nonserious felonies, and the evidence showed that he had made an effort to seek treatment for longstanding addiction issues.  (*Id*. at pp. 1141, 1143–

1144.)  Putting aside the fact that *Avila* did not involve a resentencing petition, Clarke shares nothing in common with the *Avila* defendant.  Clarke was not a youthful offender when he committed these crimes, and the record shows the court considered evidence of his drug problems and alcohol consumption but nevertheless concluded that he acted with reckless indifference to human life.  Because the evidence supports this finding, Clarke's claim of error necessarily fails.

## DISPOSITION

The order denying Clarke's petition for resentencing is affirmed.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*People v. Clarke* (A166554)

20